**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| E.S., a minor, by and through his guardian ad litem, ELIZABETH SANCHEZ, individually, and CHARLES SANCHEZ, individually, | |
| Plaintiffs, | No. 20cv1027 (EP) (AME) |
| v. | **OPINION** |
| ELIZABETH BOARD OF EDUCATION, NICHOLAS S. LA CORTE SCHOOL, JOSEPH TROIANO, JENNIFER CAMPEL, AND CRISTINA BRITO, | |
| Defendants. | |

**PADIN, District Judge.**

In this case, Plaintiffs E.S., a minor, and his parents, Elizabeth and Charles Sanchez, bring federal constitutional and state common law claims arising from a teacher's discipline of E.S. (the "Incident") and the events that followed. D.E. 49 ("SAC"). Defendants are (1) educators at E.S.'s school during the relevant events and (2) the Board of Education tasked with overseeing the school. Defendants move for summary judgment dismissing all of Plaintiffs' claims. D.E. 86-1 ("Mot." or "Motion"). The Court decides the Motion on the papers. *See* Fed. R. Civ. P. 78(b); L.Civ.R. 78(b). For the reasons below, the Motion will be **GRANTED** and the SAC will be **DISMISSED with prejudice.**

I.      **BACKGROUND**[1]

A.  **Factual Background**[2]

*1.   The parties*

Defendant Elizabeth Board of Education ("Elizabeth BOE") is a governmental body tasked with overseeing the Elizabeth School District.  Defs. SOF ¶ 1; Pls. Reply to SOF ¶ 1. Defendant Joseph Troiano ("Mr. Troiano") is the former music teacher of Nicholas S. LaCorte-Peterstown School Number 3 ("School No. 3").   Defs. SOF ¶ 5; Pls. Reply to SOF ¶ 5. Defendant Jennifer Campel has been the Principal of School No. 3 since November 2010 ("Principal Campel").  Defs. SOF ¶ 6; Pls. Reply to SOF ¶ 6.  Defendant Cristina Brito[3] is the former Vice Principal of School No. 3 ("Vice Principal Brito").  Defs. SOF ¶ 7; Pls. SOF ¶ 7. Mr. Troiano, Principal Campel, and Vice Principal Brito ("Faculty Defendants") held their respective positions during the relevant events.  *See* Defs. SOF ¶¶ 5-7; Pls. SOF ¶¶ 5-7.

Plaintiff E.S., a former student at School No. 3, was enrolled as a fifth-grade student in Mr. Troiano's music class the day of the Incident.  Defs. SOF ¶¶ 8, 10; Pls. Reply to SOF ¶¶ 8, 10.  Plaintiffs Charles and Elizabeth Sanchez ("Mr. and Mrs. Sanchez") are E.S.'s parents.  Defs. SOF ¶ 9; Pls. Reply to SOF ¶ 9.

*2.   The Incident*

The Incident occurred in School No. 3's gym on June 21, 2017, the penultimate day of the school year.  *See* Defs. SOF ¶ 27; Pls. Reply to SOF ¶ 27.  Mr. Troiano was setting up equipment in the gym for a kindergarten graduation ceremony.  *See* Pls. Counter-SOF ¶ 2; Defs.

---

[1] This section derives mainly from the parties' statements of facts.  *See* D.E.s 86-2 ("Defs. SOF"), 98-1 ("Pls. Reply to SOF"), 98-2 ("Pls. Counter-SOF"), 102-1 ("Defs. Reply to Counter-SOF").  For clarity, the Court collectively uses "Defendants" and "Plaintiffs" when referencing the parties' briefing, even where a claim pertains to one Plaintiff and/or Defendant.
[2] The facts are undisputed unless otherwise noted.
[3] Now Cristina Viegas.

Reply to Counter-SOF ¶ 2.  While doing so, Mr. Troiano was also tasked with supervising a class of students, which included E.S.  Pls. Counter-SOF ¶ 5; Defs. Reply to Counter-SOF ¶ 5. Mr. Troiano instructed the class to sit in the folding chairs that were set up for the ceremony. *See* Pls. Counter-SOF ¶¶ 2 & 6; Defs. Reply to Pls. Counter-SOF ¶¶ 2 & 6.

At one point, E.S. began laying across a female student's lap and throwing himself to the floor multiple times.  *See* Defs. SOF ¶ 30 (citing D.E. 86-5 Ex. 9 ("Surveillance Video"), 37:21-40); Pls. Reply to SOF ¶ 30.[4]  During one instance where E.S. was on the floor, "another student moved into the seat E.S. was previously sitting in."  Defs. SOF ¶ 31 (citing Surveillance Video 37:21-40); Pls. Reply to SOF ¶ 31.  "E.S. then started to wriggle his way between two students in an attempt to regain his seat."  Defs. SOF ¶ 32 (citing Surveillance Video 38:14-25); Pls. Reply to SOF ¶ 32.  "When he was unable to do so, E.S. pushed between the seats (while also forcefully knocking into the students that were sitting in them), walked back around the chairs, and took the fourth seat from the end."  Defs. SOF ¶ 33 (citing Surveillance Video 38:14-28); Pls. Reply to SOF ¶ 33.

While this was happening, Mr. Troiano was bringing a podium into the gym for the ceremony.  Defs. SOF ¶ 34 (citing Surveillance Video 38:30-39); Pls. Reply to SOF ¶ 34.  "As Mr. Troiano moved the podium into the corner of the gym, E.S. sat back down on the ground before retaking his seat."  Defs. SOF ¶ 35 (citing Surveillance Video 38:49-39:07); Pls. Reply to SOF ¶ 35.  "E.S. was [then] lying between two female students who were tickling him and

---

[4] Though Plaintiffs deny this statement of fact, Plaintiffs, without citation to the record, state only that "[t]he video speaks for itself."  Pls. Reply to SOF ¶ 30.  Pursuant to Local Rule 56.1, this fact is deemed undisputed for purposes of this Motion.  *See* L.Civ.R. 56.1 (emphasis added) ("The opponent of summary judgment shall furnish, with its opposition papers, a responsive statement [to the movant's] material facts, addressing each paragraph of the movant's statement . . . ."  If the opponent denies the movant's fact, the opponent must "**cit[e] to the affidavits and other documents submitted in connection with the motion" or otherwise concede the fact**.). The Court has also independently reviewed the Surveillance Video.

causing him to laugh."  Defs. SOF ¶ 36 (citing D.E. 5 Ex. 7 ("E.S. Dep."), 25:5-10; Pls. Reply to

Defs. SOF. ¶ 36.  Mr. Troiano observed this behavior and instructed E.S. to "get up."  Defs. SOF

¶ 37 (citing E.S. Dep. 25:11-12); Pls. Reply to SOF ¶ 37.

     The parties' stories then diverge.

     E.S. claims that he asked Mr. Troiano "why" he needed to get up, and, in his words:

> then after a minute he told me to get up, he grabbed me by my arm,
> and he pulled me out of my chair.  And I remember me trying to go
> back to my chair and I asked him why he did that and as I was
> trying to go back to my chair he would have his fist out by my
> chest, [he] kept pushing me with his fist, harder, a little harder each
> time.

Pls. Counter-SOF ¶ 10 (quoting E.S. Dep. 25:11-25:18); *see also* Defs. Reply to Counter-SOF ¶

10 (admitting E.S. so testified but denying its accuracy).  As a result, he experienced "a bruise on

his arm and chest pains."  Pls. Counter-SOF ¶ 11 (citing E.S. Dep. 27:22-28:23); *see also* Defs.

Reply to Counter-SOF ¶ 10 (quoting E.S. Dep. 27:22-28:11) ("Admitted that E.S. reported chest

pains and 'a little bruise' that lasted a '[c]ouple weeks.'").

     Defendants claim that after E.S. was out of his seat, "Mr. Troiano then used his body and

simply pointed towards the gym's exit with his arms outstretched."  Defs. SOF ¶ 39 (citing

Surveillance Video 39:52-59).  "E.S. [then] defied Mr. Troiano's directions and tried to get back

to his chair, but Mr. Troiano stood in his path and mirrored him."  *Id.* ¶ 40 (citing Surveillance

Video 39:55-40:09).  Defendants deny that Mr. Troiano pushed E.S. with his fist.  Defs. Reply to

Counter-SOF ¶ 10.

     The parties agree that a kindergarten teacher then "acted swiftly and 'kind of pulled

[E.S.] away and . . . told [him] to leave.'"  Defs. SOF ¶ 42 (quoting E.S. Dep. 25:18-21); Pls.

Reply to SOF ¶ 42.  The parties also agree that the Incident lasted less than one minute.  Defs.

SOF ¶ 43 (citing Surveillance Video 39:20-40:13); Pls. Reply to SOF ¶ 43.

### 3. E.S.'s parents and the police arrive

After E.S. left the gym, he went to Principal Campel's office, where they discussed the Incident before E.S.'s parents were called.  Defs. SOF ¶ 46; Pls. Reply to SOF ¶ 46.  E.S. reported to Principal Campel that Mr. Troiano "grabbed him and then [Mr. Troiano] punched [E.S.] or . . . hit [E.S.] in his chest."  Pls. Counter-SOF ¶ 14 (quoting 86-5 Ex. 5 ("Campel Dep."), 25:25-36:7 & 37:24-38-5); *see also* Defs. Reply to Counter-SOF ¶ 14 (admitting E.S. so reported but denying its accuracy).  Principal Campel told Vice Principal Brito about the Incident.  *See* Defs. SOF ¶¶ 47-48; Pls. Reply to SOF ¶¶ 47-48.  Mr. Troiano reported to Principal Campel that E.S. was being disruptive and uncooperative before the Incident.  Pls. Counter-SOF ¶ 15 (citing Campel Dep. 37:4-17); Defs. Reply to Counter-SOF ¶ 15.

Mr. Sanchez arrived at School No. 3 and spoke with E.S., who described to his father how Mr. Troiano hit him in the chest, which Mr. Sanchez interpreted as "a two[-]fisted punch to the chest."  Pls. Counter-SOF ¶ 16 (quoting D.E. 86-5 Ex. 10 ("Mr. Sanchez Dep."), 24:9-24); Defs. Reply to Counter-SOF ¶ 16.  At some point, Mrs. Sanchez arrived.  Defs. SOF ¶ 55; Pls. SOF ¶ 55. The police were called[5] and eventually arrived around 4 or 5 p.m.; E.S. and his parents spoke to the police before E.S. took an ambulance to the hospital.  Defs. SOF ¶¶ 53 & 55; Pls. Reply to SOF ¶¶ 53 & 55.

---

[5] The parties dispute who called the police and when.  *See, e.g.*, Defs. SOF ¶¶ 50-52; Pls. Reply to SOF ¶¶ 50-52.  The parties also dispute facts regarding the ensuing investigations by Principal Campel and the police.  *See, e.g.*, Defs. SOF ¶¶ 60-63; Pls. SOF ¶¶ 60-63.  None of the disputes are material to this Motion.

*4. The Surveillance Video*

Though the gym does not have surveillance cameras, there is a surveillance camera in the gym hallway, which captures the following line of sight:



Surveillance Video 0:00; *see also* Pls. Counter-SOF ¶ 25; Defs. Reply to Counter-SOF ¶ 25. This camera in the gym hallway captured most, if not nearly all, of the Incident.  *See* Pls. Counter-SOF ¶ 25; Defs. Reply to Counter-SOF ¶ 25.  On the day of the Incident, Mr. Sanchez was "shown the closed-circuit camera in the hallway by the security guard . . . ."  Pls. Counter-SOF ¶ 17; Defs. Reply to Counter-SOF ¶ 17.  E.S., when later shown the Surveillance Video, "admit[ted] the [Surveillance V]ideo does not reveal a punch."  Defs. SOF ¶ 44 (citing E.S. Dep. 81:10-87:20); Pls. Reply to SOF ¶ 44.  But the parties disagree as to whether the camera captured the entire Incident between Mr. Troiano and E.S.: Defendants claim the Surveillance Video demonstrates that Mr. Troiano never punched E.S., but Plaintiffs claim the punches must have occurred off-camera.  *See, e.g.*, Defs. SOF ¶ 45; Pls. Reply to SOF ¶ 45.

*5. After the Incident*

Plaintiffs claim that after they complained about the Incident, Defendants engaged in retaliatory acts against Plaintiffs.  Defs. SOF ¶ 64; Pls. Reply to SOF ¶ 64.

As for E.S., he claims that when he returned for the next school year, School No. 3's teachers and administrators began following him around the school hallways.  Defs. SOF ¶ 65; Pls. SOF ¶ 65.  Specifically, "if E.S. stopped moving, the teacher of administrator following him would stop.  If E.S. went to the bathroom, he was followed and [the teacher and/or administrator] would wait outside."  Pls. SOF ¶ 36 (citing E.S. Dep. at 94:18-95:8); Defs. SOF ¶ 36 (admitting E.S. so testified).[6]  "This occurred despite [Principal] Campel and [Vice Principal] Brito's offices being located on a different floor from E.S.'s classes."  Pls. SOF ¶ 33 (citing E.S. Dep. 96:15-96:23); Defs. SOF ¶ 33 (admitting the offices were on a different floor).

As for Mr. and Mrs. Sanchez, they claim they were retaliated against when Principal Campel photographed "Mr. Sanchez's vehicle during school dismissal because his vehicle was blocking the crosswalk and interfering with the safe dismissal of students at the end of the day." Defs. SOF ¶ 71 (citing Campel Dep. 85:10-14); Pls. Reply to Defs. SOF ¶ 71.  Mr. and Mrs. Sanchez were also banned from School No. 3's premises, which they claim was because of their complaints about the Incident, Pls. SOF ¶ 24 (citing Mr. Sanchez Dep. 41:13-41:19), whereas Defendants claim it was because the parents "screamed at and used foul language directed towards a teacher, administrators, and security in front of students and other staff members[,]" Defs. Reply to SOF ¶ 40 (first citing Campel Dep. 82:13-84:20; then citing 102-2 Ex. A (report detailing interaction)).

---

[6] E.S. could not identify when or where this occurred, nor how often.  See Defs. SOF ¶ 66 (citing E.S. Dep. 90:14-92:2, 113:2-12, 113:21-114:13).  Plaintiffs deny this statement of fact but cite no evidence to the contrary.  *See* Pls. Reply to SOF ¶ 65.  Rather, Plaintiffs broadly claim that the "following and watching [of] E.S." occurred "[t]he rest of the time E.S. was at School [No.] 3 . . . ."  *See id.* (citing E.S. Dep. 90-7-90:25).  But E.S. testified that he was not followed every day at every minute.  *See* E.S. Dep. 91:1-20.

*6. E.S.'s psychological injuries and expert report*

E.S. claims that because of the above, he developed "severe trust issues and anxiety disorders" and felt unsafe in school, which caused his parents to request E.S.'s transfer from School No. 3.  Pls. Counter-SOF ¶¶ 39-40; Defs. Reply to Counter-SOF ¶¶ 39-40.  Though E.S. was eventually transferred, he still ultimately dropped out of school.  Pls. Counter-SOF ¶ 40; Defs. Reply to Counter-SOF ¶ 40.

As evidence of his psychological injuries, E.S. provides an expert report by Dr. Balveen Singh ("Dr. Singh"), a board-certified psychiatrist.  Defs. SOF ¶ 75 (citing D.E. 86-5 Ex. 16 ("Singh Report")); Pls. Reply to SOF ¶ 75.  Dr. Singh diagnosed E.S. with post-traumatic stress disorder ("PTSD"), generalized anxiety disorder, mild depression, panic disorder, and social phobia disorder, all caused by the Incident.  Defs. SOF ¶ 78 (citing Singh Report at 6-7); Pls. Reply to SOF ¶ 78.  Dr. Singh based this diagnosis on conversations with E.S. and Mrs. Sanchez during the evaluation, which spanned a couple hours over one day.  Defs. SOF ¶ 77; Pls. Reply to SOF ¶ 77.  Dr. Singh did not review E.S.'s medical history before or after her evaluation. Defs. SOF ¶ 76; Pls. Reply to SOF ¶ 76.

## B.  Procedural Background

Plaintiffs filed this suit against Defendants on January 30, 2020, bringing multiple federal constitutional and state common law claims.  D.E. 1.  Defendants moved to dismiss, and the motion was partially granted.  D.E.s 7, 13, 14.  Plaintiffs then twice amended the complaint, with Defendants moving to dismiss each iteration of the complaint.  *See* D.E.s 16, 19, 49, 50.  After the Court's multiple decisions,[7] the following claims remain:

---

[7] Judge Claire C. Cecchi (D.E. 13); Judge Julien Xavier Neals (D.E. 47); and the undersigned (D.E. 78).

- E.S.'s assault and battery claim against Mr. Troiano (Count One);
- E.S.'s negligence claim against all Defendants (Count Two);[8]
- E.S.'s intentional infliction of emotional distress claim against Faculty Defendants (Count Three);
- E.S.'s Fourteenth Amendment substantive due process claim under 42 U.S.C. § 1983 against Mr. Troiano (Count Four); and
- Plaintiffs' First Amendment retaliation claims under 42 U.S.C. § 1983 against Faculty Defendants (Count Five).

*See* SAC ¶¶ 57-104.

Defendants now move for summary judgment on all claims.  Mot.  Plaintiffs oppose.  D.E. 98 ("Opp'n").  Defendants reply.  D.E. 102 ("Reply").

## II.   LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law[,]" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Disputes over nonmaterial facts will not preclude a court from granting summary judgment.  *See id.*

The moving party has the initial burden of showing the basis for its motion and demonstrating that there is an absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party must support its motion by citing to specific materials in the record.  Fed. R. Civ. P. 56(c)(1)(A).

If a moving party adequately supports its motion, then the burden shifts to the nonmoving party to "go beyond the pleadings" and designate specific facts on the record that demonstrate a

---

[8] This is the only remaining claim against Elizabeth BOE.

genuine dispute for trial exists.  *Celotex Corp.*, 477 U.S. at 324 (internal quotation marks omitted).  Specifically, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party.  *Anderson*, 477 U.S. at 250.  If the nonmoving party fails to provide such evidence, or where the "evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment."  *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50).  However, "[i]f reasonable minds could differ as to the import of the evidence," summary judgment is inappropriate.  *Anderson*, 477 U.S. at 250-51.

In reviewing a motion for summary judgment, a court "may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"  *Marina v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).  But if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case[,]" then there is "no genuine issue as to any material fact[,]" and summary judgment is appropriate.  *Celotex Corp.*, 477 U.S. at 322.

## III.   ANALYSIS

### A.  There is No Genuine Dispute of Material Fact that Mr. Troiano Did Not Punch E.S.

Defendants argue that the Surveillance Video, combined with E.S.'s testimony, reveals that there is no genuine dispute of material fact that Mr. Troiano did not punch E.S.  Mot. at 1-2.

Specifically, E.S. had previously stated that after Mr. Troiano initially told him to "get up," the following occurred:

> then after a minute he told me to get up, he grabbed me by my arm, and he pulled me out of my chair.  And I remember me trying to go back to my chair and I asked him why he did that and as I was

trying to go back to my chair he would have his fist out by my chest, [he] kept pushing me with his fist, harder, a little harder each time.

Reply at 2 (quoting E.S. Dep. 25:9-21); *see also* Pls. Counter-SOF ¶ 10 (quoting E.S. Dep. 25:11-25:18). But, at E.S.'s deposition, Defendants' counsel "walked [E.S.] through the video in segments[,]" and E.S. identified what portions of the footage matched his original account of events. Mot. at 1-2. E.S. "pinpointed":[9]

    (1) "the exact moment he was pulled out of the chair (39:49 mark on the [Surveillance V]ideo);"[10]



---

[9] The Court includes corresponding images captured from the Surveillance Video.
[10] E.S. is at the top left of the image, standing in a dark-colored shirt to the left.

(2) "when [Mr.] Troiano then told him to leave the gym and go to the principal's office (39:50-53);"[11]



---

[11] Mr. Troiano is at the top left of the image, standing in a dark-colored shirt with writing, to the left of E.S.

(3) "when E.S. tried to walk past [Mr.] Troiano (39:56);" and



(4) "when [Mr.] Troiano subsequently made contact with [E.S.] again by grabbing his arm (not punching or pushing him) (39:56-59)."



Reply at 2-3 (cleaned up) (citing E.S. Dep. 81:10-84:7).

E.S. then admitted, and Plaintiffs do not deny, that the Surveillance Video does not reveal any punches. *Id.* at 2 (citing E.S. Dep. 81:10-87:20); *see also* Pls. Reply to SOF ¶ 45. The Court agrees with Defendants that E.S.'s moment-by-moment coupling of his original account with the Surveillance Video footage demonstrates there is no genuine dispute of material fact that Mr. Troiano did not punch E.S.

The burden now shifts to Plaintiffs to demonstrate, through the record, why a genuine dispute of material fact exists. *See Celotex Corp.*, 477 U.S. at 324. Plaintiffs argue that the punches occurred off-camera, before E.S. and Mr. Troiano came into view and the remainder of events unfolded. Opp'n at 2. In support, Plaintiffs highlight that there are no physical cameras in the gym—only in the hallway—and thus not every class and/or student in the gym was captured on video. *Id.*; *see also* Pls. Reply to SOF ¶ 45 (first citing Campel Dep. 46:6-9 ("Q. How many cameras are in the gym? A. Just that one, and that's only like in the hallways. There are no physical cameras in the gym, it's in the hallway of the gym for the doors."); then citing E.S. Dep. 108:20-23 ("Q. Lying on the floor, was it just you that was doing that? A. No, there was a couple classes in that gym that the camera didn't obviously see . . . .")).

But the gym's lack of cameras is a red herring. The gym's lack of cameras would only be relevant if the Incident had occurred in a portion of the gym not surveilled by a camera, which is not the case here. Thus, Plaintiffs must cite to evidence that contradicts E.S.'s one-for-one lineup of the alleged events with the Surveillance Video footage. Specifically, Plaintiffs must cite evidence that demonstrates a genuine dispute of material fact that Mr. Troiano punched E.S. *before* grabbing his arm and pulling the two within the hallway camera's line of sight.

But Plaintiffs do not cite any evidence suggesting that Mr. Troiano initiated any physical contact, let alone punches, before Mr. Troiano grabbed E.S.'s arm and pulled him out of the chair. Indeed, E.S.'s own testimony forecloses this possibility. *Compare* E.S. Dep. 25:9-21 (claiming only that Mr. Troiano punched E.S. after E.S. tried to return to his seat) *with id.* 81:10-84:7) (identifying when the Surveillance Video shows E.S. trying to return to his seat, after which Mr. Troiano and E.S. do not appear off-camera throughout the remainder of the Incident). To defeat summary judgment, Plaintiffs "must do more than simply show that there is some

metaphysical doubt as to material facts." *Messa*, 122 F. Supp. 2d at 528 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

Nor does the Surveillance Video support that Mr. Troiano initiated any physical contact before he grabbed E.S.'s arm and pulled him out of the chair.  The Surveillance Video shows E.S. sitting and looking in the direction of his classmate two seconds before Mr. Troiano grabs his arm:



Surveillance Video 39:47.

Accordingly, because no rational trier of fact could conclude that Mr. Troiano punched E.S., the Court will analyze E.S.'s claims correspondingly.

**B. Defendants are Immune as to E.S.'s Negligence Claim, or, Alternatively, E.S. Cannot Establish Permanent Damages**

To make a prima facie case for common law negligence in New Jersey, a plaintiff must plead (1) a duty of care, (2) a breach of that duty, (3) proximate cause, and (4) actual damages. *See Townsend v. Pierre*, 221 N.J. 36, 51 (2015).  E.S. alleges that Defendants are liable for negligently breaching their duty to protect E.S. from foreseeable harm in relation to (1) the Incident and (2) Faculty Defendants following E.S. around school.  *See* SAC ¶¶ 67-75 (Count Two).

15

*1. Faculty Defendants are entitled to Coverdell Act immunity*

The purpose of the Paul D. Coverdell Teacher Protection Act of 2001 ("Coverdell Act"), 20 U.S.C. § 7942, is to "immunize reasonable classroom actions needed to maintain order, discipline, and an environment appropriate for education." *Hamilton v. Spriggle*, 2011 WL 13350468, at *2 (M.D. Pa. Nov. 30, 2011). The Coverdell Act provides that "no teacher in a school shall be liable for harm caused by an act or omission of the teacher on behalf of the school" if the teacher was acting (1) within the scope of their employment; and (2) "in furtherance of efforts to control, discipline, expel, or suspend a student or maintain order or control in the classroom or school . . . ." 20 U.S.C. § 7956(a). However, a teacher is not entitled to Coverdell Act immunity if (1) their actions violated "Federal, State, [or] local laws (including rules and regulations)"; or (2) the student's alleged harm was "caused by willful or criminal misconduct, gross negligence, reckless misconduct, or a conscious, flagrant indifference to the rights or safety of the individual harmed by the teacher[] . . . ." *Id.*

Defendants argue that Faculty Defendants, and consequently the Elizabeth BOE, are entitled to Coverdell Act immunity. Mot. at 6.

*a. Mr. Troiano is entitled to Coverdell Act immunity as to the Incident*

Defendants argue Mr. Troiano is entitled to immunity as to the Incident because his conduct of grabbing E.S.'s arm, pulling E.S. out of his chair, and spreading his arms to block E.S. from returning to his seat was done to "to address disorder . . . by sending a student to the principal's office and physically redirecting him." Mot. at 7-8. In response, Plaintiffs raise three arguments. None are persuasive.

First, Plaintiffs argue that Mr. Troiano is not entitled to immunity because his conduct served no pedagogical purpose. Opp'n at 11 (citing *Wilcox v. Andalusia City Sch. Bd. of Educ.*,

16

660 F. Supp. 3d 1167 (M.D. Ala. 2023)).  But the case Plaintiffs cite in support is inapposite.  In *Wilcox*, the court found a teacher's actions served no pedagogical purpose where he "subjected [the student] to verbal sexual harassment, unwanted touching, and stalking[,]" such as by "repeatedly request[ing] sex from [the student,]" among a litany of other acts.  660 F. Supp. 3d at 1179.  Nothing similar is alleged here, and E.S. admitted the Incident occurred as part of Mr. Troiano's efforts to send E.S. to Principal Campel's office, which is a pedagogical purpose.  *See, e.g.*, Reply at 4 (citing E.S. Dep. 82:1-83:25 ("Q.  And where is [Mr. Troiano] telling you to go . . . ?  A.  He's telling me to leave.  Q.  And go where?  A.  To the office.  Q.  The Principal's office, right?  A. Yes.")).

Additionally, even if the Court assumes Mr. Troiano's "methods . . . [were] less than ideal[,]" this does not, on its own, defeat Coverdell Act immunity.  *See Clines v. Special Admin. Bd. Transitional Sch. Dist. of St. Louis*, 2020 U.S. Dist. LEXIS 203336, at *40-41 (E.D. Mo. Oct. 9, 2020) (citation omitted) (Coverdell Act immunity found where teacher "grabbed [a non-verbal student] by the foot" during the student's outburst "and threw [the student's] foot upwards, causing [the student] to fall to the ground and sustain injuries").

Second, Plaintiffs argue that Mr. Troiano violated New Jersey law because he put his hands on E.S. when there was no "threat to a student or teacher."  Opp'n at 12.  But Plaintiffs do not cite any New Jersey law or case in support.

Finally, Plaintiffs argue that Mr. Troiano violated Elizabeth BOE's discipline procedure, which "provides that no teacher should instruct a student to leave a classroom."  *Id.*  First, Plaintiffs do not cite anything to support that Elizabeth BOE's discipline procedure has the force of a "local law," as required to find Coverdell Act immunity does not apply.  *See id.*; 20 U.S.C. § 7956(a).  Second, as Defendants respond, Mr. Troiano did not simply tell E.S. to leave the

gym; rather, he told E.S. to report to Principal Campel's office, and it "would be absurd" to find that the common disciplinary practice of "tell[ing] a misbehaving student to report to the principal's office" is beyond the protection of the Coverdell Act, Reply at 4, which was created to "immunize reasonable classroom actions needed to maintain order [and] discipline," *Hamilton*, 2011 WL 13350468, at *2.

Accordingly, this branch of E.S.'s negligence claim (Count Two) against Mr. Troiano will be dismissed.

> ### b. *Faculty Defendants are also entitled to immune as to following E.S. during school*

Next, Defendants argue that Faculty Defendants are entitled to immunity as to the branch of E.S.'s negligence claim that is based on them following E.S. around School No. 3.  Mot. at 8.  Defendants highlight that E.S. could not identify where, when, or how many times he was followed.  *Id.*  But, they argue that "[i]n any event, it's simply not unreasonable for school personnel to walk the halls in schools and ensure students aren't misbehaving[,]" and this "conduct [is] consistent with maintaining order in the school[] . . . ."  *Id.*  Plaintiffs respond that this conduct is not consistent with maintaining order in the school because "E.S. was a good student who enjoyed going to school until the unprovoked assault by [Mr.] Troiano."  Opp'n at 13.

The Court agrees with Defendants.  Plaintiffs do not explain how E.S. being a "good student" correlates to whether monitoring his behavior during the school day is inconsistent with maintaining order.  *See* 20 U.S.C. § 7956(a).  Nor do Plaintiffs cite any federal, state, or local law that prohibits a teacher, principal, and/or vice principal from monitoring a student during school, even if this monitoring was non-stop, which E.S. admits it was not.  *See* E.S. Dep. 91:1-20.

Accordingly, the second branch of E.S.'s negligence claim (Count Two) against Faculty Defendants will be dismissed.

    *c.  The Elizabeth BOE is entitled to immunity*

The Elizbeth BOE is entitled to immunity as to both branches of E.S.'s negligence claim because Mr. Troiano and Faculty Defendants are immune from these branches.  *See* N.J.S.A. § 59:2-1 (If a public employee is entitled to "any immunity . . . provided by law[,]" so is their public entity employer.); *Fielder v. Stomack*, 141 N.J. 101, 118 (1995) (same).

Accordingly, because all Defendants are immune from E.S.'s negligence claim (Count Two), the claim will be dismissed in its entirety.

    *2.  Alternatively, E.S. cannot establish damages*

New Jersey law requires a plaintiff who brings a claim against a public entity and/or employee with damages of only "pain and suffering" to demonstrate (1) "a permanent loss of a bodily function, permanent disfigurement or dismemberment" and (2) "medical treatment expenses . . . in excess of $3600.00."  N.J.S.A. § 59:9-2(d).  To satisfy the first threshold requirement, a plaintiff must show "an objective permanent injury and a permanent loss of a bodily function that is substantial."  *Hoag v. Brown*, 397 N.J. Super. 34, 57 (App. Div. 2007).

In *Collins v. Union County Jail*, 150 N.J. 407 (1997), the Court found that a plaintiff may recover for a purely psychological injury when there are "aggravating circumstances."  This is a narrow exception, and the aggravating circumstances must compare to circumstances like rape, sexual molestation and abuse, and the birth of a stillborn child as a result of medical malpractice.  *See Pravata v. Univ. of Med. & Dentistry of N.J.*, 2006 WL 3228624, at *4 (Sup. Ct. App. Div. Nov. 9, 2006) (citing cases).  If a plaintiff can demonstrate aggravating circumstances, they must

then provide evidence of the permanency of their mental condition.  *See Gerber ex rel. Gerber v. Springfield Bd. of Educ.*, 744 A.2d 670, 677 (Sup. Ct. App. Div. Feb. 3, 2000).

First, Defendants argue that E.S.'s emotional distress does not arise from "aggravated circumstances" like sexual assault, and thus he cannot recover.  Mot. at 11.  Plaintiffs do not respond to this argument.  *See* Opp'n at 15-18.  The Court agrees; a teacher grabbing and/or pulling a student's arm and then using his body to block the student's path and/or faculty following a student in school hallways during school hours is not comparable to rape, sexual abuse, or birthing a stillborn child.  *See Pravata*, at *4 (finding no comparable aggravated circumstances to these examples where the plaintiff, a former corrections officer, was pricked by an inmate's hypodermic needle and was anxious he was infected with HIV); *Leone-Zwillinger v. New Jersey*, 2007 WL 1175786, at *3 (D.N.J. Apr. 19, 2007) (cleaned up) ("[W]hen a party fails to offer any argument or evidence . . . in opposition to defendants' motion for summary judgment, such claims may be deemed to have been abandoned.").

Next, Defendants argue that even if there were aggravating circumstances, E.S. has failed to provide any evidence that his psychological injuries are permanent.  Mot. at 11-12.  Defendants highlight that Dr. Singh, Plaintiffs' expert, did not offer any opinion on permanency.  *Id.* at 12 (citing Singh Dep. 76:21-25).  In response, Plaintiffs argue that there is evidence of permanency because the Singh Report "reflects that more than half a decade after the incident[,] E.S. report[ed] feeling like a different person" and continued suffering from PTSD, anxiety, panic disorder, and social phobia disorder.  Opp'n at 16-17 (cleaned up) (citing Singh Report at 6-7).  And Plaintiffs argue that even if the Singh Report failed to establish permanency, that Dr. Singh offered in her deposition to give an opinion on the issue.  *Id.* at 16 (citing Singh Dep. 75:20-22).

The Court agrees with Defendants.  Evidence that E.S. presently suffers from psychological injuries is not evidence that this suffering is permanent, nor can Dr. Singh offer to provide evidence overcome summary judgment where that evidence has not been provided.  *See Gerber*, 328 N.J. Super. at 36 (finding plaintiff's PTSD symptoms six years post-incident did not, on its own, establish permanency at summary judgment, especially where plaintiff's "fatal flaw" was that her experts had not provided such evidence).  *Contra Collins*, 150 N.J. at 421 ("Plaintiff's psychologist testified that th[e] psychological [symptoms of plaintiff's PTSD] are a direct result of the rape and will in all probability afflict plaintiff for the rest of his life.").

Accordingly, E.S.'s failure to meet the threshold requirements of aggravating circumstances and permanency provides two alternative grounds to dismiss his negligence claim against Defendants (Count Two).

### C. Faculty Defendants are Entitled to Qualified Immunity on Plaintiffs' Constitutional Claims

Qualified immunity shields government officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The doctrine "provides ample protection to all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  "In resolving questions of qualified immunity, courts are required to resolve a 'threshold question: taken in the light most favorable to the party asserting injury, do the facts alleged show the offic[ial]'s conduct violated a constitutional right?"  *Scott v. Harris*, 550 U.S. 372, 377 (2007) (cleaned up).  Next, courts must determine "whether the right was clearly established . . . in light of the specific context of the case."  *Id.* (cleaned up).

Plaintiffs bring two constitutional claims under 42 U.S.C. § 1983: (1) E.S.'s substantive due process claim against Mr. Troiano and (2) Plaintiffs' First Amendment retaliation claim against Faculty Defendants. *See* SAC ¶¶ 83-94 (Count Four), 96-104 (Count Five). Defendants argue Faculty Defendants are entitled to qualified immunity on all claims, Mot. at 13 & 20, which Plaintiffs oppose, Opp'n at 18 & 26. The Court agrees.

  *1. Mr. Troiano is entitled to qualified immunity as to E.S.'s substantive due process claim*

"The Due Process Clause provides that a state shall not 'deprive any person of life, liberty, or property, without due process of law." *Morrow v. Balaski*, 719 F.3d 160, 166 (3d Cir. 2013) (quoting U.S. CONST. amend. XIV, § 1). "[T]he substantive component of due process[] . . . 'protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them." *Id.* (cleaned up) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)).

E.S. asserts a substantive due process claim against Mr. Troiano for his conduct during the Incident. *See* SAC ¶¶ 83-95 (Count Four).

  *a. Mr. Troiano's conduct does not "shock the conscience"*

A substantive due process claim is only actionable if the complained-of conduct "shocks the conscience and violates the decencies of civilized conduct." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (cleaned up). "'While the measure of what is conscience-shocking is no calibrated yard stick,'" the conduct must be "so 'brutal' and 'offensive' that [the actor] did not comport with traditional ideas of fair play and decency.'" *Thornbury Noble, Ltd. v. Thornbury Twshp.*, 112 Fed. App'x 185, 188 (3d Cir. 2004) (cleaned up) (first quoting *Lewis*, 523 U.S. at 847; then quoting *Rochin v. California*, 342 U.S. 165, 172-73 (1952); then quoting *Breithaupt v. Abram*, 352 U.S. 432, 435 (1957)). Whether conduct "'shocks the conscience' is a

matter of law for the courts to decide."  *Benn v. Univ. Health Sys.*, 371 F.3d 165, 174 (3d Cir.

2004).  In making this determination, a court can consider four factors:

> [(1)] Was there a pedagogical justification for the use of force?;
> [(2)] Was the force utilized excessive to meet the legitimate objective in this situation?;
> [(3)] Was the force applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm?; and
> [(4)] Was there a serious injury?

*Gottlieb ex rel. Calabria v. Laurel Highlands Sch. Dist.*, 272 F.3d 168, 173 (3d Cir. 2001).

Defendants argue that Mr. Troiano's conduct of grabbing E.S.'s arm, pulling E.S. out of

the chair, and using his body to prevent E.S. from returning to his seat "simply does not meet the

conscience-shocking standard."  Mot. at 16.  In support, Defendants compare Mr. Troiano's

conduct to numerous cases where courts found, at the summary judgment stage, that a teacher's

conduct did not shock the conscience, including where a teacher (1) slapped a student across the

face,[12] (2) punched a student,[13] (3) hit a student with a plastic bat,[14] and (4) pulled a student's

---

[12] *See Lilliard v. Shelby Cnty. Bd. of Educ.*, 76 F.3d 716, 726 (6th Cir. 1996) ("While we do not mean to suggest that school systems should tolerate a teacher who slaps a student in anger, neither do we conclude that one slap, even if made for no legitimate purpose, rises to the level of a constitutional violation."); *Smith v. Half Hollows Hill Cent. Sch. Dist.*, 298 F.3d 168, 170, 173 (2d Cir. 2002) (affirming dismissal of substantive due process claim where a teacher "slapped [a student] in the face at full-force with an open hand" because even though "[s]triking a student without any pedagogical or disciplinary justification . . . is undeniably wrong[,] . . . not all wrongs perpetrated by a government actor violate due process").

[13] *See Kurilla v. Callahan*, 68 F. Supp. 2d 556, 564 (M.D. Pa. 1999) (finding a teacher's "striking of a blow to [the student's] chest" that "caused a bruise and some red marks" was "akin to the slap across the student's face considered in *Lilliard*"); *Thomas v. Bd. of Educ. of West Greene Sch. Dist.*, 467 F. Supp. 2d 483, 487, 491 (W.D. Pa. 2006) (finding that a teacher "forcefully punch[ing a student], with a closed fist, in the upper chest/collarbone area" and "knock[ing the student] backwards" did not shock the conscience).

[14] *See Gonzales v. Passino*, 222 F. Supp. 2d 1277, 1282 (D.N.M. 2002) ("One hit with a plastic bat on the arm, even a hard smack, simply does not have the potential to cause serious harm to an eighth-grade student," especially where "[t]he day after the incident[,] the medical exam revealed only 'faint bruising' and tenderness on [the student's] arm.").

arm;[15] Defendants argue Mr. Troiano's conduct "does not even come close to the conduct cited in the[se] cases . . . ." *Id.* at 14-16 (citing cases).

In response, Plaintiffs argue only that Mr. Troiano's conduct "shocks the conscience," and thus is unlike the cases cited by Defendants, because Mr. Troiano's conduct did not serve a pedagogical purpose.   Opp'n at 21.   Notwithstanding that the Court already determined Mr. Troiano's conduct served a pedagogical purpose,[16] whether a teacher's conduct served a pedagogical purpose is not dispositive.   *See Gottlieb*, 272 F.3d at 174 (finding no substantive due process violation even where it was "unclear what pedagogical objective [the teacher's] alleged push might have served").   Other factors favor Mr. Troiano, such as that his conduct did not cause a serious injury, as E.S. reported only a small bruise on his arm after the Incident, and that the force was not excessive.   *See, e.g.*, *Gonzales*, 222 F. Supp. 2d at 1282 (finding no serious harm where "[t]he day after the incident[,] the medical exam revealed only 'faint bruising' and tenderness on [the student's] arm"); *infra* Section III(D) (finding Mr. Troiano used a reasonable amount of force).   Plaintiffs make no other attempt to distinguish this case from the cases cited by Defendants where "courts had rejected a substantive due process claim where teachers had used much more force than [Mr. Troiano] is accused of employing here."   Reply at 8.

Accordingly, Mr. Troiano is entitled to qualified immunity as to E.S.'s substantive due process claim (Count Four), which will be dismissed.

---

[15] *See Jones v. Witinski*, 931 F. Supp. 364, 370-71 (M.D. Pa. 1996) (dismissing a substantive due process claim where the teacher allegedly grabbed a student's arm and pulled the student across a desk even where the student "may have sustained serious injury" because "[i]t appears from all the evidence before us that [the teacher] never intended to harm [the student]").

[16] *See supra* Section III(B)(1)(a).

*b. Mr. Troiano did not violate any clearly established right*

Alternatively, the Court finds that Mr. Troiano is entitled to qualified immunity under the second prong of the analysis because he did not violate any clearly established right.  A right is considered clearly established if the right is so "sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (cleaned up).  "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."  *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).  Courts should first look to applicable Supreme Court precedent, and if none exists, then "it may be possible that a robust consensus of cases of persuasive authority in the Court of Appeals could clearly establish a right for purposes of qualified immunity."  *Mammaro v. N.J. Div. of Child Prot. & Permanency*, 814 F.3d 164, 169 (3d Cir. 2016) (cleaned up).

Additionally, a clearly established right must be defined with specificity, and not "at a high level of generality."  *Mullenix*, 577 U.S. at 7 (quoting *al-Kidd*, 563 U.S. at 742).  A court must look to "whether the violative nature of *particular* conduct is clearly established[]" when looking at "the specific context of the case . . . ."  *Id.* (cleaned up) (emphasis in original).

Defendants argue that Mr. Troiano is entitled to qualified immunity because there is no Supreme Court precedent "nor a robust consensus of persuasive authority in the Court of Appeals . . . that says directing a student out of the classroom due to his poor behavior" or "physically removing a student from his chair when he refuses to leave the room" violates the Fourteenth Amendment.  Mot. at 19 (internal quotation marks omitted).  And again, Defendants

point out that "as demonstrated above, more egregious conduct has been found *not* to constitute a substantive due process violation." *Id.* (emphasis in original) (citing cases).[17]

In response, Plaintiffs argue that E.S.'s "right to bodily integrity[,]" specifically "consensual touch between teachers and students" when being disciplined, is clearly established. Opp'n at 19.  Plaintiffs cite two cases in support, neither of which is like this case.

First, Plaintiffs cite *Stoneking v. Bradford Area School District*, 882 F.2d 720 (3d Cir. 1989), *cert. denied*, 493 U.S. 1044 (1990).  Opp'n at 19.  In *Stoneking*, the Third Circuit found that "the district court did not err in denying the motion for summary judgment . . . on grounds of qualified immunity" where two administrators were alleged to be responsible when the school's band director "used physical force, threats of reprisal, [and] intimidation and coercion to sexually abuse and harass [plaintiff] and to force her to engage in various sexual acts" over the course of plaintiff's high school education.  *Stoneking*, 882 F.2d at 722.  Because E.S.'s allegations are dissimilar, this does not clearly establish that E.S. has an absolute right to consensual touch when being disciplined at school.

Second, Plaintiffs cite *Metzger v. Osbeck*, 841 F.2d 518 (3d Cir. 1998).  Opp'n at 19.  In *Metzger*, a school faculty member, after hearing plaintiff, a student, using "foul language," "placed his arms around [the student's] neck and shoulder area[,]" which eventually caused the student to "los[e] consciousness" and "f[a]ll face down onto the pool deck . . . ."  841 F.2d at 519.  As a result, the student "suffered lacerations to his lower lip, a broken nose, fractured teeth[,] and other injuries requiring hospitalization."  *Id.* at 519-20.  Here, E.S. was grabbed and pulled by the arm, sustaining a minor bruise.  He did not lose consciousness, hit any part of his body on a hard surface, or sustain any injury requiring hospitalization.  Thus, *Metzger* also does

---

[17] *See supra* nn.12-15.

not clearly establish a right to not be grabbed and pulled by the arm when being disciplined. *See Betz v. Satteson*, 259 F. Supp. 3d 132, 189 (M.D. Pa. 2017) (finding that plaintiff cannot "strip away [a defendant's] entitlement to qualified immunity by cherry-picking generic due process quotations from hoary cases").

Accordingly, the lack of a clearly established right provides an additional basis for the Court to find Mr. Troiano is entitled to qualified immunity on the substantive due process claim (Count Four).

2. *Faculty Defendants are entitled to qualified immunity as to Plaintiffs' First Amendment retaliation claims*

To establish a First Amendment retaliation claim, a plaintiff must show that (1) they engaged in a protected activity, (2) the retaliatory act would sufficiently "deter a person of ordinary firmness from exercising [their] rights," and (3) a causal connection exists between the protected activity and the retaliatory act. *Lauren W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).

Plaintiffs allege that they engaged in protected activities "when they complained about [Mr.] Troiano's conduct to [School No. 3's administrators], filed a police report and criminal complaint, filed the instant lawsuit, and started an online petition imploring other parents to support Defendant Troiano's removal as a teacher in the school." Opp'n at 28; *see also* SAC ¶¶ 40-45. Plaintiffs allege the retaliatory acts were (1) Faculty Defendants following E.S. around school, (2) Principal Campel taking a picture of Mr. Sanchez's car, and (3) hiring a private investigator who left a business card at Plaintiffs' house.[18] *See* SAC ¶¶ 32, 46, 96-104 (Count FIve).

a. *The complained-of conduct does not support a First Amendment retaliation claim*

---

[18] Defendants ultimately deny this occurred. *See, e.g.*, Mot. at 23.

To establish a First Amendment retaliation claim, though the complained-of conduct "need not be great in order to be actionable," it must be more than *de minimus* to be considered capable of "deter[ring] a person of ordinary firmness" from exercising their First Amendment rights. *Noonan v. Kane*, 698 Fed. App'x 49, 53 (3d Cir. 2017) (citing *Suppan v. Dadonna*, 2023 F.3d 229, 235 (3d Cir. 2000)).   Where the "'alleged retaliatory acts were criticism, false accusations, or verbal reprimands,' a First Amendment retaliation claim typically does not exist." *Id.* (quoting *Brennan v. Norton*, 350 F.3d 399, 419 (3d Cir. 2003)).

Defendants argue that Plaintiffs' complained-of conduct is *de minimus* and therefore Plaintiffs cannot establish a First Amendment retaliation claim.  Mot. at 22-23.  In support, Defendants cite cases where (1) a meal was withheld from an inmate[19] and (2) an inmate's religious scripture was dropped on the floor,[20] both of which were found to not be retaliatory acts and which Defendants claim are more egregious acts than the complained-of conduct here.  *Id.* at 20-21.  Defendants also argue that Faculty Defendants allegedly following E.S. is necessarily *de minimus* because he only has "vague recollections" of when, where, and how often he was followed.  *Id.* at 22.  Defendants also argue that "taking a picture" of a car in a public place and "finding a business card from an investigator" are *de minimus* and could not deter a person of ordinary firmness from exercising their First Amendment rights.  *Id.* at 23.

Plaintiffs do not dispute that either act is *de minimus*.  *See* Opp'n at 26-29.  Instead, Plaintiffs make two arguments.

---

[19] *Ramey v. Marsh*, 2022 WL 363854, at *3 n.27 (M.D. Pa. Feb. 7, 2022) (citing other cases where withholding meals from inmates did not constitute retaliatory acts).

[20] *Johnson v. Valentine*, 2022 U.S. Dist. LEXIS 231605, at *11 (M.D. Pa. Dec. 27, 2022) ("[A] singled incident in which [plaintiff's] Quran was dropped to the floor[]" coupled with "vaguely threatening comments[ and] delaying . . . [plaintiff's] opportunity to use the prison commissary or phones . . . consists of nothing more than petty slights and minor annoyances with trivial or inconsequential effect.").

First, Plaintiffs argue that Faculty Defendants "following and permitting other adults to follow E.S. at all times he was moving through the school" constituted a campaign of harassment that, when considered as a whole, constitutes more than a *de minimus* act.  *Id.* at 29; *see also id.* at 28 (first citing *Brennan*, 350 F.3d at 419 n.16 & 422 n.17; then citing *Marrero v. Camden Cnty. Bd. of Soc. Servs.*, 164 F. Supp. 2d 455, 467-68 (D.N.J. 2001)).

Neither case Plaintiffs cite is convincing.  In *Brennan*, the Third Circuit noted that just because the "alleged wrongs [in this case] do not rise to the level of actionable conduct[,]" that does not mean that "some of these same wrongs can never" constitute actionable conduct.  350 F.3d 419 n.16.  This supports only that if, for example, this Court found E.S. being followed around at school was *de minimus*, that would not preclude a future finding, in a different case with a different record, that the same conduct constitutes retaliation.  And in *Marrero*, the plaintiff "asserted that, in retaliation for the various claims she filed against [defendants, they] sent her home (without pay) for violating the dress code, castigated her in front of her co-workers, [and] made derisive and unprofessional comments [before] finally dismiss[ing] her." 164 F. Supp. 2d at 467.  Notably, in *Marrero*, the plaintiff recalled specific dates and instances of harassment.  For example, she recalled specific inappropriate comments made to her, like "I can see the print of your privates."  *Id.* at 460.  Additionally, these various events took place repeatedly over the course of two years.  *Id.* at 460.  Here, E.S. recalls only that he was followed an unknown number of times in unspecified places on unspecified days over the course of a few months.  *See supra* n.7 (citing E.S. dep. 91:1-20).  And, as Defendants point out, E.S. does not differentiate between each Faculty Defendant's acts; without knowing who followed E.S. when or where or how many times, the Court cannot conclude what or whose conduct could constitute a "campaign of harassment."

Second, Plaintiffs add an additional claim of retaliation as to the parents being banned from the school's property.  *Compare* Opp'n at 26 (claiming First Amendment retaliation where Mr. and Mrs. Sanchez were "banned from the school's property after they contacted the police regarding the incident with [Mr.] Troiano") *with* SAC ¶¶ 4, 96-104 (containing the whole of Plaintiffs' remaining First Amendment retaliation allegations).  Defendants respond that the parents were banned because "they went on a verbal tirade" against "the math teacher . . . ."  Reply at 13.

The Court will not consider this additional claim.  It is "well-established" that "a plaintiff may not add new claims in an opposition to a defendant's summary judgment motion."  *Lampkin v. Donahoe*, 2017 WL 3671304, at *2 (D.N.J. Aug. 25, 2017) (citing cases).  Even construing the SAC liberally, it fails to even mention the parents were banned from the school's property, let alone allege this constitutes actionable retaliation.

Accordingly, the Faculty Defendants are entitled to qualified immunity on the First Amendment retaliation claim (Count Five), which will be dismissed.

> b.  *Alternatively, there is no clearly established law as to whether the complained-of conduct constitutes First Amendment retaliation*

Alternatively, the Court finds that Faculty Defendants are entitled to qualified immunity under the second prong of the analysis because they did not violate any clearly established right.  *See* Mot. at 23-24.  Plaintiffs do not cite,[21] nor can the Court find, any Supreme Court precedent or a robust consensus of Court of Appeal cases that prohibit either (1) school officials following a student around school hallways during school hours, (2) taking a picture of a vehicle in front of a public school, or (3) hiring a private investigator who leaves a business card, after the student and/or their parents engaged in First Amendment conduct.  *See Mullenix*, 577 U.S. at 7 (quoting

---

[21] Plaintiffs do not cite a single case or respond to Defendants' argument.  *See* Opp'n 26-30.

*al-Kidd*, 563 U.S. at 741) ("[E]xisting precedent must have placed the statutory or constitutional question beyond debate.").

Accordingly, this provides an additional ground that Faculty Defendants are entitled to qualified immunity as to the First Amendment retaliation claim (Count Five).

**D. Mr. Troiano's Conduct was Privileged and Did Not Constitute Assault or Battery**

A plaintiff alleging common law assault must show that (1) the defendant "act[ed] intending to cause a harmful or offensive contact with the [plaintiff] . . . or an imminent apprehension of such contact," and (2) the plaintiff was "thereby put in such imminent apprehension." *Wigginton v. Servidio*, 324 N.J. Super. 114, 130 (App. Div. 1999) (quoting *Restatement (Second) of Torts* § 21 (1965)). Often coupled with an assault claim, a plaintiff alleging a common law battery claim must show that the defendant (1) intended to cause a harmful or offensive contact upon the plaintiff and (2) effectuated a non-consensual touching upon the plaintiff. *Kelly v. Cnty. of Monmouth*, 380 N.J. Super. 552, 559 (App. Div. 2005).

However, the common law "privileges such force as a teacher or administrator 'reasonably believes to be necessary for (the child's) proper control, training, or education.'" *Ingraham v. Wright*, 430 U.S. 651, 661 (1977) (quoting *Restatement (Second) of Torts* § 147(2) (1965)). An educator will be subject to possible civil liability for assault and battery only if "the force is excessive or unreasonable," *id.*, or the force is not "within the scope of [the educator's] employment," N.J.S.A. § 18A:6-1. New Jersey delineates multiple circumstances where a teacher, acting within the scope of their employment, can effectuate a reasonable amount of force and not be subject to civil liability, such as "to quell a disturbance . . . ." N.J.S.A. § 18A:6-1(1).

E.S. brings common law assault and battery claims against Mr. Troiano for grabbing E.S.'s arm, pulling E.S. from the chair, and using his body to prevent E.S. from returning to his

31

seat.  *See* SAC ¶¶ 57-66 (Count One).  Defendants argue that Mr. Troiano did not intend to effectuate an assault or battery and instead simply used a reasonable amount of force consistent with a school official "maintain[ing] order, safety, and discipline" in response to E.S.'s misbehavior.  Mot. at 25 (citations omitted).  Plaintiffs respond that this case "is more than a run-of-the-mill battery case because it involves a harmful and offensive touching of a minor by an adult in a school[]" "without consent or any pedagogical justification."  Opp'n at 25.

Plaintiffs' arguments are not persuasive.  First, because this case involves an adult educator and a minor student, under common law principles and New Jersey law, this initially favors Mr. Troiano, not E.S.  *See, e.g.*, *Betz*, 259 F. Supp. 3d at 193 (cleaned up) ("[C]ontact that may amount to a battery in another context is often excusable in the academic environment so long as the defendant teacher was appropriately maintaining classroom order and discipline."); *Ingraham*, 430 U.S. at 661; N.J.S.A. § 18:A-6-1.

Second, as previously noted, Mr. Troiano's conduct served a pedagogical purpose: to stop E.S.'s misbehavior and send him to Principal Campel's office.  *See supra* Section III(B)(1)(a).  E.S. does not dispute that he, at the very least, (1) had not been sitting in a chair as required, (2) did not get up when directed to, and (3) despite Mr. Troiano's directions, tried to return to his seat.  *See* Pls. Reply to SOF ¶¶ 30-31; Pls. Counter-SOF ¶ 10 (quoting E.S. Dep. 25:11-25:18).  Thus, Mr. Troiano (1) grabbing E.S.'s arm to pull him up and (2) using his body to prevent E.S. from returning to the chair was not excessive and instead was reasonably necessary to prevent E.S.'s attempt "to otherwise flee or elude [Mr. Troiano's] control."  *Betz*, 259 F. Supp. 3d at 182 (applying similar principles and noting that in some cases, restraint is "necessary to prevent a student from unauthorized ingress or egress on school grounds").

Accordingly, because Mr. Troiano's conduct was privileged, E.S.'s assault and battery claim (Count One) will be dismissed.

### E. Faculty Defendants' Conduct was not Outrageous as Required for an Intentional Infliction of Emotional Distress Claim

"Generally speaking, to establish a claim for intentional infliction of emotional distress [('IIED')], the plaintiff must establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe." *Buckley v. Trenton Saving Fund Soc.*, 111 N.J. 355, 367 (1988) (citation omitted). For conduct to be considered "outrageous," it must "go beyond all possible bounds of decency, . . . be regarded as atrocious, and [considered] utterly intolerable in a civilized community." *Id.* This is an "elevated threshold that is satisfied only in extreme cases." *Ingraham v. Ortho-McNeil Pharm.*, 422 N.J. Super. 12, 21 (App. Div. 2011) (cleaned up). Whether this threshold is satisfied is a question of law. *Bishop v. Okidata, Inc.*, 864 F. Supp. 416, 427 (D.N.J. 1994).

E.S. brings IIED claims against Faculty Defendants for (1) Mr. Troiano's conduct during the Incident, (2) Faculty Defendants following E.S. around school, and (3) hiring of a private investigator who left a business card at Plaintiffs' house. SAC ¶¶ 76-82 (Count Three). Defendants argue that E.S. cannot establish an IIED claim because he cannot show any of the complained-of conduct was outrageous. Mot. at 27. In support, Defendants cite cases where more extreme conduct was found not to be "outrageous," such as (1) a principal grabbing a ten-year-old student's wrist, bending it backwards, and breaking it;[22] (2) state troopers placing an individual in a chokehold;[23] and (3) police striking an individual with police batons.[24] In

_____

[22] *See Leah v. Baum*, 2004 WL 2418104, at *4 (E.D. Pa. Oct. 28, 2004) (applying the same elements as New Jersey).

[23] *See Bou v. New Jersey*, 2013 WL 4517940, at *8 (D.N.J. Aug. 26, 2013) (contrasting the chokehold with examples of courts finding outrageous conduct, such as "spreading a false rumor

response, Plaintiffs argue, without citation, that Faculty Defendants' conduct was outrageous because E.S. "was a minor of only 12 years old" when it happened and the conduct was done "to get back at his parents . . . ."  Opp'n at 30-31.

The Court agrees with Defendants that their conduct was not outrageous and thus cannot support an IIED claim.  First, Mr. Troiano's conduct during the Incident was, as discussed, reasonable and specifically within the bounds of privileges afforded to educators.  *Supra* Section III(D); *see also Betz*, 259 F. Supp. 2d at 195 ("Federal courts will surely be disinclined to hold that any serious reprimand of a student constitutes [IIED]" because this "would place too much weight on the fickle emotions of modern schoolchildren.").  Additionally, Plaintiffs do not explain how an educator grabbing and/or pulling a twelve-year-old student's arm and leaving a small bruise, like here, is more "outrageous" and "utterly intolerable" than an educator grabbing a ten-year-old student's wrist and breaking it.  *See Leah*, 2004 WL 2418104, at *4.  And Mr. Troiano necessarily could not have grabbed E.S.'s arm *during* the Incident to "get back at his parents" for complaining about the Incident *after* it occurred.  *See* Opp'n at 31.

Additionally, Plaintiffs do not cite anything to support that school faculty following a student during school hours in school hallways is "utterly intolerable"; indeed, it is common for teachers and school administrators to patrol a school's halls and observe students.  Nor do Plaintiffs cite anything to support that hiring a private investigator who leaves a business card at the-family-to-be-investigated's house.  Even if Faculty Defendants acted out of spite, as Plaintiffs claim, the complained-of conduct amounts to, at most, "mere insults, indignities,

---

that plaintiff's son had hung himself[ and] bringing a mob to a plaintiff's door with a threat to lynch him if he did not leave town").
[24] *See Lankford v. City of Clifton Police Dep't*, 546 F. Supp. 3d 296, 324 (D.N.J. 2021).

threats, annoyances, petty oppressions, or other trivialities."   *Betz*, 259 F. Supp. 3d at 195 (cleaned up).  "Perceived unkindness has no remedy at law."  *Id.* (cleaned up).

Accordingly, the Court will dismiss E.S.'s IIED claim against Faculty Defendants (Count Three).

## IV.   CONCLUSION

For the reasons stated above, Defendants' Motion (D.E. 86-1) will be **GRANTED** and the SAC (D.E. 49) will be **DISMISSED with prejudice**.  An appropriate Order accompanies this Opinion.

Dated: March 19, 2024,

_____
Evelyn Padin, U.S.D.J.